May I please the court, I'm Doug Parker, I'm here for all the defendants. I would propose to take first the second case, which is Frank Bonners and Chris Stewart. This is a case involving folks who were reported to be in business together, went so far as to have an image on paper of legal documents saying they were in business. On that basis they submitted a bid to perform an extremely difficult construction project in Washington, D.C. involving the United States Capitol. And their actions, they were unable to agree on how that project was going to be implemented. Judge Reimer, I'm not getting any of what counsel is saying. Okay, just a second, we'll see if we can cure the problem.  Can you hear me now, Judge Nelson? Yes, I can hear. I take it that you're starting off to talk about the arbitration case. Actually, no, the other case. You're starting on the other one. If the parties would prefer to hear about the arbitration, I can deal with that first. No, that's okay, go ahead. Okay, so the parties had an agreement that left out many, many details. And that's crucial to how the case was decided. And it's crucial to the issues that were before Judge King in the Rule 50 motion that followed trial. The other issue, of course, that's up on appeal is Judge King's denial of our motion in limine to exclude the expert testimony of their damages expert. Judge King's order denying our Rule 50 motion consistently pointed to inferences, inferences that are too stretched to constitute substantial evidence. He allowed these inferences with respect to three critical areas of the plaintiff's intentional interference claims against my clients, Mr. Boggess and Mr. Stewart. With respect to the claim that Mr. Boggess and Mr. Stewart had engaged in improper purposes and or improper means, the inferences allowed were that with respect to improper purpose that the jury could have inferred that the defendants had acted in retaliation, retaliation against the plaintiff, Mr. Jackman, or Meadowmark's principal, Mr. Jackman, that they had retaliated because Mr. Jackman had threatened Janelle Stewart, the wife of Chris Stewart and daughter of Frank Boggess. That turns the privilege issue upon which my clients were operating, that turns it on its head. It absolutely guts any question about whether or not they were privileged to have acted to protect a family member, as allowed under the restatement, and to have protected their own financial interests. Well, I think overall what the district judge was saying is that, look, this thing went to the jury, so the question now isn't sort of like, you know, who's right and who's wrong? The question is, was there, could the jury come out the way it did? Given the fact that at trial there was no issue about purpose, in fact, it was the opposite. The question really is whether the jury could have concluded, could have found that improper means were used, and there was just an ample degree of evidence upon which that conclusion could be reached. But you have to, Your Honor, you have to distinguish between the various defendants. You have to look at each of them individually as to whether or not they engaged in improper means. There is a confusion in this case between what Janelle Stewart did, what her father did, and what her husband did. Looking at Frank Boggess, focusing on him for a minute with respect to improper means, the question is, did he act in one of those ways that Oregon law sees as improper means? Did he act improperly? Or did he engage in a deception? And the answer is there was no evidence to that effect. No evidence at all. Instead... Look, he testified that he understood what the memorandum of understanding was all about. He understood what fiduciary duties were all about. He understood what non-compete clauses were all about. Nevertheless, there is evidence that he told Janelle back out of the non-compete clause. He pulled the plug on bonding, not for the World War II project, but for the next one. He made it possible for Janelle and Chris to restart up in Virginia, gave him some bonding help, gave him physical office help, and gave him a lot of intellectual help, it would appear, in going after the bid that would have been metal marks. Now, that may not be the right result, but based upon all of those things, why couldn't the jury find that Boggess engaged in improper means? Because what's missing from all of that, Your Honor, is any evidence that Mr. Boggess knew. When he advised Janelle to get herself out of the non-compete agreement, there's no evidence that he knew that she had done so improperly. None whatsoever. And instead, the court inferred... I mean, I guess I understand that. I mean, why should there have to be? I mean, he knew that there was an agreement. He told her, bug out of it. He told her to untangle herself from it and had no evidence that she had done so improperly. There was no evidence. Mr. Boggess, and it's important to pronounce his name, it's Boggess, there's no evidence that Mr. Boggess, who's 3,000 miles away in Virginia, had any understanding as to how Janelle and Mr. Jackman undid or came to an end of their LLC agreement. There was none in the record. And instead, the court... Well, you start out by saying this was a case of inferences. The court inferred from the father-daughter relationship. Well, it was a jury that inferred. Well, the court said the jury inferred. In 1950, you look at the evidence in light, most favorable to the non-moving parties. Absolutely, Your Honor. Absolutely. He was well in it. He knew all about this arrangement, this Judge Reimer. I'm sorry? He well knew about the arrangement, the business venture, and how the parties were connected together. There was lots of evidence about that, about his role and his interest in his daughter's well-being and the success of her business, the opportunity to make money, these projects in D.C. It just seems that there was significant evidence here that the jury could draw the inferences that you say they shouldn't have drawn. Well, again, what the trial court ruled was that the inference to be drawn here was based on the father-daughter relationship. And the father is 3,000 miles away. The daughter is an adult. She's living on her own. And we submit, Your Honor, that that is too quantum elite. That's too stretched an inference to have resulted in a finding of improper means. With respect to causation, again, the court denied our Rule 50 motion on causation, indicating that the jury could have inferred that the parties might well have patched things up. And that's in the face of the only evidence that came in. By the 11th of June, before the bid on the CBC job was withdrawn, before Highland got underway and anything else, the parties had a meeting, and that meeting was critical. And at that meeting, at the meeting, and by the time of that meeting, the parties were in a state of complete anything but patching things up. By this time, Mr. Jackman had threatened the stewards, threatened to sue them, in and of itself an improper act as a matter of law for a lawyer to have done that. They had been unable to reach any kind of an agreement how the LLC was going to work. They had been able to reach any kind of agreement how this project was going to be performed, who was going to perform it, who was going to get profit, and so on. So the LLC at that point was completely meaningless, absolutely meaningless. And so to say that anything that occurred after that date harmed the LLC is a non sequitur, because the LLC itself was incapable of being harmed, because it was non-existent. It was only a piece of paper. And in response to our argument that that was the case, the argument is, well, it was. The LLC was in existence. We had an LLC. But the parties couldn't get together as to what that LLC meant. With respect to this, with respect to the inference that the parties could have patched things up, I mean, that would be somewhat similar to saying that parties to a marriage, where a marriage is obviously falling apart, might well have patched things up. These folks were clearly in a state of divorce. Mr. Jackman testified. He admitted in the courtroom that by the 11th of June he felt that they were in a state of disillusion. He acted inconsistently with the LLC as of that date, by his own purchases of the land that was supposed to be for the LLC, by having submitted a bid for another job in the name of Allie Braun's work that clearly was supposed to come within the LLC, and so on. Very briefly on damages. The court erred in admitting the testimony of Mr. Moss, the damages expert, because Mr. Moss's opinion just was not credible. The court did not perform the gatekeeper function. It should have in this instance, but instead allowed Mr. Moss's testimony to come in, testimony that completely contradicted the evidence in the case as to what the real financial situation was, and testimony that importantly contradicted the evidence of what was and what was not in the bid that had been submitted. Mr. Moss made a- That's not a gatekeeping function. That's a jury function. I mean, if there's a conflict in the evidence, there's a conflict in the evidence. But at the very outset, Your Honor, at the very outset, the court was presented with the evidence that Mr. Moss had not independently analyzed the bid. He basically rubber-stamped the numbers that had been given to him as to what the damages should be, and that in and of itself is violative of the Daubert principle. I want to turn to the arbitration case. The court did ask that we comment on the jurisdictional question raised by the Johnson v. Columbia Properties case. I'd like to be able to tell you that I think that Columbia Properties presents a jurisdictional question, but I don't think I can. Stewart Springs was an Oregon corporation, at some point not well-defined in the record, and before I became involved in the case, it was moved from Oregon to Virginia. It was incorporated in Virginia on September 8, 2005. Right. Right. And that's before the action to vacate the arbitration was filed in state court and or removed. The issue, Your Honor, is that, and again, I'd like to be able to say something to the contrary, but the parties stipulated jurisdiction. You can't stipulate a jurisdiction. I mean, the parties stipulated to a bunch of facts, from which, at the time, and given the issue that was on the district judge's mind at the time, which wasn't this issue, satisfied him. But this issue, just to make it very clear, is that you've got to have a diversity has to exist for removal jurisdiction as of the time the action is filed in state court and as of the time of removal. And here, in both instances, it was after Stewart Spring had removed itself from Oregon and incorporated in Virginia. So you had Meadowmark comprised of two entities destroying diversity, one being in Oregon and one being a Virginia entity, don't you? Yes. So how do you get out of that? I quite frankly would prefer not to, Your Honor. Well, I'm sure. Let me very briefly address the arbitration issue. The question presented to the district court on the question of whether or not there was evident partiality on the part of the arbitrator was whether or not prior contacts between the arbitrator and members of Mr. Aldersert's firm were sufficient to have required a vacature of the case. It's uncontested that the arbitrator did not disclose those contacts. What is contested is whether or not those contacts were trivial or not. The triviality question was certainly addressed recently by this court in the New Regency case, as counsel pointed out. However, New Regency does not decide, as I think they would argue, that issue against the defendant, Janelle Stewart. Rather, I think there are significant issues here as to the level of the contacts that were at issue, and most importantly, the district court's decision relied upon a holding that there were no concurrent contacts, where in fact a close reading of the declarations that were submitted by the members of Mr. Aldersert's firm indicate that there likely was concurrent representation. There was both concurrent representation and also, when you look at the Fortino and the Gidley declarations, they don't disclaim any ongoing contact with the arbitrator. Well, actually, they say they don't know whether he was even co-counsel with them, but if he were, then they had no contact with him.  Well, I'm very careful to make that argument with respect to some of the cases, but not all of them. If there are no further questions, Your Honors, I would reserve the rest of my time. Surely. Mr. Aldersert. May it please the Court, Your Honor. Your Honors, I'm Robert Aldersert, here for Applebee's. I'll turn to that jurisdiction question first on the arbitration case. Implicit in the stipulation, which I can obviously tell that you've found and reviewed, is that at the time of the filing of the petition in state court and the removal, that Stuart Springs was no longer a member of Metal Mark. How could that be? Because when this whole thing fell apart and the appellants took the contract and went to D.C. with it, they caused this dissolution. But there hadn't been a formal dissolution yet. No. In the terms of the operating agreement, as I understood the record. No, there wasn't a formal dissolution, but the operating agreement did allow for acts of dissolution that were beyond any kind of formal dissolution. And the facts of the matter is they left town, they left Joseph in July of 2003, and never came back. Now, implicit in that stipulation, we – you know, it's not in the stipulation. We didn't think to put it in the stipulation. But we couldn't have stipulated to all those facts unless that were true. And the appellants have never challenged the notion that they are no longer a part of Metal Mark. They've never challenged it at any level, including the award, the judgment. They've never claimed any part of it. And in fact, in the red brief itself on the first page that we put into this Court, we say Valley Bronze is the sole member of Metal Mark and Valley Bronze is an Oregon corporation. That wasn't challenged on the reply. I can tell you that we would not have stipulated without that had the issue come up. We were – we moved to remand the case because we didn't think there was diversity. And then when this came up, when the judge basically marshaled us through that, we agreed to all those facts. And I'm sure we would have agreed to that fact as well, but it just never came up. So the factual basis is that at the relevant time – was it Springs, Virginia? Stewart Springs was no longer an Oregon corporation. It had incorporated itself. It had moved to Virginia and had reincorporated – the way they put it was transfer the assets and reincorporated itself in Virginia, dissolved itself in Oregon. And was no longer a member of Metal Mark. Correct. Metal Mark. But that had happened – that's our position. That had happened long before that in 2003. Excuse me. I'm sorry. I'm sorry. Are you – I just – I'm sorry. We're in the stipulation. Do I get the fact that it – there was a dissolution? It's not stated. Well, okay. But what fact is there in there that necessarily implies it? Well, underlying the case, for instance, when the parties reached a stalemate on what they were doing, there were accusations flying back and forth. You've caused a dissolution. The other side said you've caused a dissolution. I understand. That was part – that's the main – that's the main. So there's no dispute there was a dissolution. It's just who caused it. And you don't have – under the operating agreement, you don't have to have a formal dissolution to have a dissolution. There are – it's 9.2c, I believe, where it discusses acts of dissolution as well. So – But it seems to contemplate certain procedures will follow in order to wind up. You'd hope. The LLC. I think it does, Your Honor. And it says even during the wind-up period, they shouldn't – they're not to engage in certain kinds of activities. Yeah. That's true, and fiduciary duties apply to everybody even during wind-up. Right. But the facts of the matter are they left town, never to be heard from again. Well, I mean, just the fact that they left town wouldn't have anything to do with – I mean, it's terrible. I'm sorry, Your Honor. I mean, if everything had been hunky-dory between Janell and Jackman. Right. The fact that Janell moved back to Virginia and Stewart Springs moved back to Virginia wouldn't affect Meadowmark. Not in itself, certainly. However, what they did was tantamount to withdraw. They cut all ties with Oregon, as they said. Are you asking us to take that on faith? I mean, the problem is there's not exactly a fact. There's no fact that just sort of says that. I agree. I'm arguing that these facts are implicit or else we wouldn't have agreed to it. And all I can tell you is I'm confident of the fact that that would have been in there. We would not – we understood that you cannot agree to jurisdiction, but you can stipulate to the facts. I understand. And I just re-read the stipulation now to see if I was missing something. And that's all I see is just the bare-bones statement about removing itself back to Virginia. There was one in open court, I believe that counsel for the appellant said, we're severing all ties with Virginia. And I also mentioned in open court where this started to roll that Mr. Jackman was the sole remaining manager of Meadowmark with the obvious implication that Stuart Springs was out of it. And that was in the record, in Judge King's mind. It just never made it to the stipulation because it wasn't the specific issue we were contemplating. Okay. Thank you. I guess I'll just stay on the merits of the arbitration for a minute. I think we all agree on the standards here that evident partiality arises where the undisclosed contacts create a reasonable impression of partiality. And if you look at the cases, there's not the cases finding evident partiality all tend to center around some affiliation that's undisclosed between the arbitrator and a party. If you just go down the list, the Commonwealth Codings case was an example of that. The arbitrator hadn't disclosed that he had relationships with a party on some projects that were at issue. In the Schmitz case from the Ninth Circuit, there was a firm that had represented a party, a parent of the party, in 19 cases and hadn't disclosed it. And in the new Regency case, which just came out in the fall, and we pointed out last week to the executive and a company that was negotiating a major deal with one of the parties. Now, and there's another one. In our research, we saw that the district courts of this circuit were following the standard like that. There's this HSMV case. They found evident partiality where an arbitrator's firm had represented the government of Australia, which happened to own one of the parties in the case. So these are the sort of cases where evident partiality is found. Where it's not found is where you have these trivial contacts we would submit, like the ones that are complained of here between the arbitrator and members of my firm. The closest, if you, just for framework, the trivial cases, for instance, there's this Aposento Garden case from 1996 in the Ninth Circuit. The arbitrator and an expert witness were passive investors in a real estate project. That was trivial, no evident partiality. There's a Seventh Circuit case. The arbitrator had a relationship with the president of a party that had ended 14 years before. That was trivial. Fourth Circuit case, A.N.B. Cole. The arbitrator had represented the sole customer of a party. And the law firm that he was with had briefly merged with another firm who had represented the party. That was considered trivial. When it comes down to it, the closest case that's been cited is this Eleventh Circuit University Commons case. And there the Court found that a past where the arbitrator and counsel had represented co-defendants in a case, a past case, that was trivial, no evident partiality. The Court was concerned that the very same lawyer, the individual lawyer, the lawyer in my position, lead counsel at the arbitration, was also at the same time representing a co-defendant with the arbitrator, separate co-defendants, in another case. And the Eleventh Circuit was concerned about that. Now, of course, we don't have that here. I wasn't representing a case or a co-defendant in a case with the arbitrator at the same time. But the Eleventh Circuit was concerned, and they remanded it. The district court found that while that might have been true, that those were trivial and no reasonable arbitrator or reasonable party to an arbitration would have found that to be a conflict that would give pause. So I think our case, if you just go through an inductive reasoning of looking at all these, is far closer to the trivial and nowhere near the party affiliations that are the concerns of most of these courts. And I would just add one more thing. Just the practical implications of what an arbitrator would have to do in this circumstance, it seems to me if this were held to be some sort of or nontrivial and evident partiality, all lawyer arbitrators would have to keep lists of all their cases and all lawyers who ever appeared in any of those cases in any capacity and maintain that list and disclose the entire list to anybody that chose them or wanted to choose them to be an arbitrator. And I think that's just too onerous a burden as a matter of policy. Unless you have further questions on the arbitration, I'll turn to the jury trial. Judge Reimer, I think it's obvious to me you understand our position on the improper means prong of this. There was plenty of evidence from which a jury could have inferred sufficient knowledge of duties, and notwithstanding that, Frank Boggess engineered basically the new entity and supported it and allowed Janelle Stewart to take it, to leave Oregon, take the job with her, and leave Metal Mark empty. There wasn't much said about Chris Stewart. I will say that Chris Stewart also had the knowledge. In the briefs you'll see references to the record where he had read the operating agreements. In fact, he had read drafts of the operating agreements before they were signed. He actually was concerned about the non-competes at the time, and he brought that up. He accompanied Janelle Stewart to the meeting where they persuaded the general contractor that Metal Mark and Valley Bronze were incapable of doing the job. And in the week before, he had formed his new company to take over the job. So I don't think there's any question that he had the knowledge and then supported her throughout the usurpation. As far as Mr. Moss, during the motion in Limoney, the judge was concerned with methodology. Mr. Moss explained his methodology. He used the expectation model, which is exactly what the Oregon State Damage Law countenances. In fact, it's in the jury instruction itself. As you said, Judge Reimer, it really goes to the weight, and the jury surely considered that. It didn't award what he advocated for, but it did fight damages. And there are independent basis for the damages, especially Mr. Boggess' pro forma predicting $2.4 million in damages before the job was done and the other record references to especially Janelle Stewart's methodology in coming up with the bid numbers. So unless you have specific questions. I don't think so. Okay. Thank you. Mr. Parker. Going back to the question that Mr. Aldiser just touched upon, and that's the expectation model upon which Mr. Moss relied, I urge the court to look very carefully at that. The proof was basically looking at what Metalmark said it expected, or allegedly expected. However, the expectation model, according to the very legal sources relied upon by the plaintiffs, has to be able to look to the contract itself to be able to determine the damage. In this instance, the only contractual documents that were to be looked at to determine damages was the bid, the bid itself. There are no other contract documents that allow you to ascertain what the damage might be in this instance, what the expectation might be. In other words, under this model, the way they put it together, it basically allows the plaintiff to come in with as high an expectancy as their expert wants it to be. And he came in with a very high one. Came in alleging that this company, which had never performed this kind of work before, didn't have the means and ability to perform this kind of work at this point, didn't have the kinds of employees it needed, but nonetheless was going to perform the work at an incredible 40% profit. Now that, and I understand the argument that, well, the jury discounted and heard all that and discounted down by one quarter. But the fact of the matter is, the expert was allowed to come in with this very flimsy approach and basically to taint the jury into believing there was some damage. He put his imprimatur as an expert on this whole notion of damage when he should not have been allowed to. Thank you very much. Thank you. Thank you both, counsel. The matter just argued will be submitted. And the final argument for the day will be in part by telephone, so we have to see. Mary, is somebody going to be here in person? Somebody's here in person or is it both on phone? Oh, they're both on the phone. Okay. Thank you. Oh, yeah. That was a... Oh, my goodness. Potentially someday that could, we could come to court. Hello? Hello? Catherine, can you hear me? Hello? Catherine? Catherine? Catherine? Catherine? Can you hear me? Can you hear anyone? Hello?  Hello? Hello, this is Catherine. Catherine? Yes. Yes, you're a little light, but I'm fine. Okay, thank you. Hello? Hello? Hello? Hello? Hello? Your call cannot be conceded as dialed. I'll just like text her. That's a good question. The number you are calling does not accept unidentified calls. If you are a solicitor, please hang up now. Otherwise, please enter the 10-digit telephone number you are calling from.   Hello? Are we going to the Oscar for Special Effects? Hello? Yes. Okay. Okay. Catherine? I don't know. Hello? Hello, this is Catherine. Catherine? Catherine, this is Mary. Mary? Catherine? Yes. Okay, hold on again. Mary, I can barely hear you. Okay, I'll try to fix that. Let me see if I can get this on. Is that it just sitting there? Well, I mean there's... Nothing else to do? Yeah, basically. Since I don't have any briefs and I don't know anything. I don't have my Booski materials yet. Catherine, are you still there? It's possible I could be good this morning. No. It's very hopeful that they were here already. Yeah, I can't. It's just amazing. Monday? I can't remember the details. I just can't. It's just noise. It's overwhelming. Hello, this is Catherine. Catherine, this is Mary again. I apologize. We're having a problem with the system. Okay. I'm going to try to get Mr. Ellsbury again, okay? Okay. Oh, it's not connected into the sound system, I guess. The number you are calling does not accept unidentified calls. If you are a solicitor, please hang up now. Otherwise, please enter the 10-digit telephone number you are calling from. Hello? Hi, Mr. Ellsbury. This is Mary again. Hi. We're having a bit of a problem with the phone, so just be patient with us. We're going to try to get Catherine on the phone again. Okay. Is this an anymore thing? No. Okay. Okay. Okay. Okay. Mary, is there any reason we can't just use this regular telephone? It won't catch through to the audio, I don't think. I'm not sure. But that just means we couldn't record it or whatever. Yeah. Yeah, it's not a game. Can Tom hear it? Put a speaker right by it. Put a mic right by it. Okay. So, Ronnie, should I put them on speaker? Put it on speaker. Yeah. Well, our voice is in the room, but their voice is not. Yeah. Can you two speak to see if we can hear you over the system? This is Catherine. Catherine, are you? This is Tom Elsberry. Okay. Don't anybody cough. Okay. I'm assuming Judge Nelson can hear them. Judge Nelson, can you hear? Yes, I can hear. Okay. Okay. Thank you, counsel. Sorry for the problem, but the system is a little ill. Now we have Ms. Hassenary on, yes? Yes, I am. Let me see. I just changed something here, but I. You're on the line, yes? Actually. Mr. Elsberry, are you on the line? I am on the line. All right. This is Judge Reimer. Judge Nelson is on. Judge Paez is here on the bench, and he is also connected. So all of that said, we'll hear from.
judges: Rymer, Nelson, Paez